13-1594-cv (L)
*Hardison v. Bd. of Ed. Oneonta City School District*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

August Term, 2013

(Argued: January 16, 2014                    Decided: December 3, 2014)

Docket Nos. 13-1594-cv; 13-1843-cv
_____

STEWART HARDISON and KATHERINE HARDISON on behalf of their daughter, A.N.H., a
student with a disability,

*Appellees, Cross-Appellants*,

-*v.*-

BOARD OF EDUCATION OF THE ONEONTA CITY SCHOOL DISTRICT,

*Appellant, Cross-Appellee*.
_____

Before:            STRAUB, HALL, and LIVINGSTON, *Circuit Judges*
_____

On appeal from a judgment of the United States District Court for the Northern
District of New York (Suddaby, *J.*), reversing in part a State Review Officer's
determination to deny reimbursement for private schooling under the Individuals with
Disabilities Education Act.  Because we hold that the district court should have shown
greater deference to the determinations of the State Review Officer, we REVERSE the
judgment by the district court to the extent that it granted IDEA reimbursement.
_____

CRYSTAL M. DOODY, ESQ., Legal Services of Central New York, Syracuse, New
York, *for Stewart Hardison and Katherine Hardison*

KENNETH S. RITZENBERG, ESQ., Young, Sommer, Ward, Ritzenberg, Baker and
Moore LLC, Albany, New York *for Board of Education of the Oneonta City
School District*

_____

HALL, J.:

This Individuals with Disabilities Education Act ("IDEA") case[1] centers on the degree of deference to be afforded to a State Review Officer's ("SRO") determination that parents seeking reimbursement for the unilateral placement of their emotionally disabled child in a private school had not placed sufficient evidence on the record to establish that their placement was appropriate.

## BACKGROUND

A.      Statutory and Regulatory Background

Under the IDEA, states receiving federal funds must provide "all children with disabilities" a "free appropriate public education," ("FAPE").   20 U.S.C. § 1412(a)(1)(A).  "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits, and provided in conformity with an individualized education program, or IEP."  *Reyes ex rel R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014) (internal quotation marks and citations omitted).  School districts are required by the IDEA to prepare an IEP for disabled

_____

[1] **Glossary of Acronyms:** As in other cases brought under IDEA, the court finds it useful to supply a list of the acronyms used in this opinion.  *See M.H. & E.K. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 223 n.1 (2d Cir. 2012) ("This opinion, dealing as it does with the IDEA and practices thereunder, is replete with acronyms.").

| | |
|---|---|
| CSE | Committee on Special Education: the team responsible for creating the IEP |
| FAPE | Free Appropriate Public Education: educational program and related services mandated by IDEA for children with disabilities |
| IDEA | Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. |
| IEP | Individualized Education Plan: customized education plan developed for a child with a disability |
| IHO | Impartial Hearing Officer |
| SRO | State Review Officer |

students annually, and those IEPs "must include the child's present levels of academic achievement and functional performance, goals and objectives for the child, and the special education and related services to be provided to the child so that he or she can advance toward attaining those goals and objectives." *Id.* (citing 20 U.S.C. § 1414(d)).

New York law provides for Committees on Special Education ("CSEs") that are responsible for creating IEPs. *Id.* at 214–15 (citing N.Y. Educ. Law § 4402(1)(b)(1)). If the recommendation of a CSE is unacceptable, or no recommendation is made or effectuated, the parents of the disabled child may challenge the CSE's determination by filing what is known as a "due process complaint." N.Y. Educ. Law § 4404(1). Filing the complaint triggers an administrative procedure by which the board of education appoints an Independent Hearing Officer ("IHO") who conducts a formal hearing and fact-finding. Either party may appeal an IHO's decision to an SRO. N.Y. Educ. Law § 4404(2). The SRO's decision may be appealed via civil suit in New York State Supreme Court or federal district court. N.Y. Educ. Law § 4404(3); 20 U.S.C. § 1415(i)(2)(A).

Parents who disagree with a CSE's determination and believe that a FAPE is not being provided to their child "may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district." *Reyes*, 760 F.3d at 215 (citing 20 U.S.C. § 1412(a)(10)(C)(ii)). Reimbursement is not automatic and "will be granted only if (1) the proposed IEP failed to provide the student with an appropriate public education; (2) the parent's private placement was appropriate to the child's needs; and (3) equitable considerations support the parent's claim." *Id.* As with other challenges to a CSE's recommendation, parents must file a due process complaint and participate in the administrative process to receive reimbursement. *Id.* (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)). At a hearing before the IHO

3

in which the parents are seeking reimbursement, New York law requires that the school district prove that its "proposed IEP provided the child a FAPE," but the parents must prove "the appropriateness of the private placement." *Id.* (citing N.Y. Educ. Law § 4404(1)(c)).

B.      Factual and Procedural Background

*Through the 2006–2007 School Year*

In 1992, the Hardisons adopted the three-day old A.N.H. While A.N.H. always had some oppositional issues with her parents and briefly saw two mental health professionals for depression during middle school, she progressed successfully in a regular education program in the Oneonta School District (the "District") until school year 2006–2007.

Starting in the fall of 2006, during her ninth-grade year at Oneonta High School, A.N.H.'s academic performance began to decline, and she began to exhibit problematic behaviors. Although she remained in the regular program, A.N.H. began receiving additional remedial and support services after her parents met with District staff about her difficulties. In November 2006, A.N.H. was tentatively diagnosed with bipolar disorder and was prescribed medications for "depression" and "mood stability" by a psychiatric nurse practitioner. Following an arrest for shoplifting in January of 2007, A.N.H. was placed in a diversion program, assigned a probation officer, and required to participate in mental health counseling.

A.N.H.'s District guidance counselor and Mrs. Hardison requested that the school engage in an evaluation of A.N.H. designed to gather information on why she was having difficulty at school. The evaluation request identified A.N.H. as having difficulty where she "very often blanks out or draws a blank" when trying to remember vocabulary, having a "hard time processing steps of information" when following instructions, drifting when attempting to pay attention to "demonstrations or media information," blanking when answering out loud, only completing homework assignments half of the time, "almost never" being prepared for class,

4

having a "totally disorganized" notebook, being "possib[ly] withdrawn," being "very immature socially," "need[ing] prodding" to do work, not taking pride in her work, and lacking motivation. Less than two months later, after it became clear that A.N.H. would fail nearly all of her classes that year, her parents removed A.N.H. from school, sending her to live with her grandmother (a retired teacher) until the end of June 2007. A.N.H. failed all but two of her 2006–2007 classes and received 25 incident discipline reports for unexcused absences from class, tardiness, and disruptive class behavior that year.

In late June and early July 2007, as part of her diversion program, A.N.H. was evaluated by a psychologist. In a report that was not sent to the District, the psychologist recommended that A.N.H. be required to attend family counseling, that she receive treatment from a therapist, and that she be further evaluated. The report did not identify her as learning disabled or recommend a CSE referral.

*The 2007–2008 School Year*

Nominally in the tenth grade, A.N.H. repeated ninth-grade courses at Oneonta High School until September 2007, when she was required by the Otsego Family Court to undergo a thirty-day psychiatric evaluation and a ten-day hospitalization at Four Winds Psychiatric Facility ("Four Winds"). Four Winds notified the District of the evaluation, providing the District with a "School Services Discharge Report" and the Hardisons with a "Discharge Summary." The School Services Discharge Report noted that A.N.H. "should have little difficulty reentering the academic program [and w]ill continue to benefit from the emotional and academic supports present in her academic program." The report "suggested that the guidance counselor schedule weekly meetings for the first three to four weeks after [A.N.H.] returns to school and then

5

evaluate the number of meetings that would be beneficial to her for the next prescribed period of time," but it did not suggest the need for a CSE-referral.

Less than a month after her October 3, 2007 return to Oneonta High School, however, A.N.H. ran away and attempted suicide, resulting in hospitalization followed by a twelve-day admission to Brattleboro Retreat ("Brattleboro"). At Brattleboro, A.N.H. was diagnosed with an unspecified mood disorder and given a "guarded" prognosis. Brattleboro documents indicated that A.N.H. would receive "individual therapy" and, together with her parents, would "meet with school staff to develop a plan for reentry." The Hardisons notified the District's attendance office of A.N.H.'s absence, but the discharge summary prepared by Brattleboro—indicating the diagnosis and her history of self-injury, running away, and arguing with her parents—was not given to the District until January 8, 2008. An evaluation was prepared by a Brattleboro psychologist, but it was not provided to the District until the appeals process culminating in this litigation was underway.

Following discharge from Brattleboro, A.N.H. began going to the District's Bugbee Program ("Bugbee") by agreement between her parents and the District. There, she was tutored between two and four hours a day in math, English, global, and social studies. A.N.H. was also offered programming at Oneonta High School during this time. While she was still often unprepared for class, A.N.H.'s grades improved significantly at Bugbee, and she was observed in the hallways interacting positively with friends.

On November 13, 2007, the Hardisons requested the District perform a formal CSE assessment of A.N.H. After the Hardisons were advised of their due process rights and consented to the evaluation, the District's school psychologist evaluated A.N.H. In making her evaluation, the school psychologist met with the Hardisons, interviewed A.N.H., and had A.N.H.

6

complete intelligence and performance tests. The school psychologist's report noted that Mrs. Hardison "believes that [A.N.H.] should be able to pass and do fairly well but she lacks the desire" and that, "[u]ntil [A.N.H.] is willing to do her work . . . outside tutoring is the best option." The Hardisons seemed to think that if A.N.H. was returned to Oneonta High School full-time, her prior patterns would resume. The psychologist opined that, despite A.N.H. receiving average scores on the intelligence and performance tests, "outside mental health factors appear[ed] to be causing a significant disruption in [A.N.H.'s] life within school" and that "[t]he CSE will need to determine to what extent [A.N.H.'s] mental health issues are impacting her educationally."

The District convened a CSE meeting on January 31, 2008, which A.N.H. and her parents attended. Much of the meeting was spent discussing what supports could be put into place for A.N.H., but no official IEP was created for her. The notes from that meeting indicated that the participants believed classifying A.N.H. "due to mental health factors [was not] the first choice." Instead, the District altered A.N.H.'s schedule to split time between the high school and Bugbee, also adding extra supports at the high school.

A.N.H.'s return to Oneonta High School lasted only three days. According to Mrs. Hardison, A.N.H. stated that she could not handle being back at the high school because "everybody knew she had been at a mental hospital." After a particularly upsetting conversation between A.N.H. and her boyfriend, Mr. Hardison informed the District of his daughter's trouble adjusting and requested that she return to Bugbee, which the District permitted. This time A.N.H.'s troubles followed her to Bugbee, and in March 2008 Mrs. Hardison e-mailed a teacher and two other district employees, informing them that A.N.H. was "collapsing into depression." The e-mail indicated that the Hardisons would now try to get A.N.H. "a place in a hospital or

other therapeutic environment" and thanked the recipients for being "really supportive and helpful" with trying to find accommodations for A.N.H.

The Hardisons did not make another referral to the CSE, nor did the District convene the CSE on its own. Instead, Mrs. Hardison sent an email to A.N.H.'s guidance counselor, informing him that they were working on enrolling A.N.H. at the Family Foundation School ("Family Foundation"). The District answered questions for the Hardisons and provided a copy of A.N.H.'s transcript to Family Foundation. The Hardisons did not inform the District during this exchange that they would be seeking tuition reimbursement.

A.N.H. initially enrolled in Family Foundation for only a few days, returning to Bugbee because she tested positive for pregnancy and had been asked to leave. Shortly thereafter, A.N.H. was hospitalized at Brattleboro again and diagnosed with "Major Depressive Disorder." The paperwork from this stay, which indicated that she had "[i]nadequate supports," but did not state that A.N.H. should be referred to the CSE, was not provided to the District.

On or about July 4, 2008, A.N.H. miscarried and remained in care for approximately two weeks. Afterwards, she was re-enrolled in Family Foundation. Appellants again did not inform the District that they would be seeking tuition reimbursement.

*The Family Foundation School*

Family Foundation is a registered therapeutic boarding school in good standing with the New York State Department of Regents. It provides a New York State Regents Curriculum and is accredited by the Middle States Association of Colleges and Secondary Schools and the Joint Commission, organizations which accredit academic institutions and health care organizations, respectively. Family Foundation's program is designed to provide more support than a typical school. It is in session 50 weeks a year with teacher availability on evenings and weekends.

Family Foundation offers small class sizes, typically between eight and twelve students per class. Teachers at Family Foundation have a range of qualifications, some have Ph.D.'s, while others have only a high school degree, some are certified by New York State to teach the subjects that they are teaching, and some are not.

The general structure of Family Foundation's program is that of a twelve-step program. There are twice-daily support-group-like counseling sessions called "table topic." In addition, there are weekly "family group" meetings with five or six students per group and a "family counselor." A.N.H.'s family counselor is a clinical social worker with a master's degree in education, but no certification as a psychologist. There are also voluntary groups addressing anger management, grief and loss, social phobia, body image, and other topics. The scheduled meetings of the groups attended by A.N.H. varied in frequency from weekly to twice a month. The group leaders for the topical groups are not necessarily credentialed mental health practitioners, but each has life experience with the problem being discussed. The group leaders are supervised by a licensed clinical social worker who does not have a psychology certification.

Individual counseling is available in the form of one-on-one meetings with a student's family counselor or with the student's "staff sponsor," an adult who functions similarly to a sponsor in a twelve-step program. Family Foundation has a consulting psychiatrist and a psychologist on staff, but they did not regularly meet with A.N.H.

Family Foundation is not a New York State-approved special education school. According to a staff member, it has chosen not to seek approval because its program is not designed for traditionally learning disabled students. Rather, Family Foundation's program is designed for students in need of therapeutic intervention. The overall academic structure is

designed to provide support, including evening teacher availability and tutoring by more advanced students.

A.N.H. did not receive regular services from a licensed psychologist while at Family Foundation, although she did meet regularly with her family counselor as part of her "family group." She took part in "table topic," and she participated in targeted "adoption" and "grief and loss survivor" groups. A.N.H. and her parents also engaged in structured family therapy run by A.N.H.'s family counselor, but the record does not reflect how often this took place. Shortly after enrolling at Family Foundation, she was given some one-on-one counseling in response to a crisis brought on by the transition and the miscarriage. The record does not reflect how often she has engaged in one-on-one counseling with the staff psychologist or family counselor since that time.

Since attending Family Foundation, A.N.H.'s grades have improved, although they have been less than perfect. She has received passing grades in most subjects but has received grades in the failing range (below 75 at Family Foundation) in two subjects and was failing another as of February 2009. Other than the state Regents examinations, Family Foundation does not conduct annual testing to measure the progress of its students.

During the period covered by this litigation, the Hardisons paid the tuition at Family Foundation. No bills for A.N.H.'s schooling there have been sent directly to the District.

*The 2008–2009 School Year*

In August 2008, Mr. Hardison informed the District that A.N.H was enrolled in Family Foundation and requested "some tuition assistance."[2] The District refused, indicating that it could not provide reimbursement because A.N.H. was not classified as disabled and Family

---

[2] The Hardisons lived at their second home outside of the geographic area covered by the District for certain periods of A.N.H.'s enrollment at Family Foundation. They do not seek reimbursement for those periods.

Foundation was not on the list of approved special education schools. In response, the Hardisons indicated that they would seek legal counsel. The District did not reconvene the CSE at that time. A.N.H. remained enrolled at Family Foundation.

On October 8, 2008, on the advice of legal services staff, the Hardisons made a referral to the Hancock Central School District ("Hancock"), which is located in the same area as Family Foundation, but they did not provide a copy of the referral letter to the District. This referral was pursuant to New York Education Law § 3602-c, which calls for the public provision of special education services to students enrolled in non-public schools. In January 2009, in response to the Hardisons' request, Hancock's psychologist, Jason Hans, evaluated A.N.H. During the evaluation, A.N.H. indicated that she was "not feeling depressed anymore and no longer takes medication for her depression. She stated that she has been feeling better since July when she returned to" Family Foundation.

Hancock's CSE—which was composed of the Hardisons, a parent advocate employed by the Hardisons' legal counsel, two Hancock employees, and three Family Foundation staff— determined that A.N.H. was classifiable as a student with "Emotional Disturbance." Hancock created, but never implemented, an Individualized Education Service Plan ("IESP"), which is functionally identical to an IEP, for A.N.H. The IESP indicated that "[n]o significant learning problems were noted with the exception of a lack of effort and attention to detail at times," that A.N.H. "continue[d] to exhibit emotional difficulties," and that "Staff at [Family Foundation] reported continuing emotional concerns." It identified her needs as (1) "a therapeutic environment . . . . She will consult with the psychologist, psychiatrist, and social worker as needed," (2) "an intensive program to assist her with her emotional and behavioral difficulties," and (3) "a program that can assist [her] with her drug issues." Although the IESP did not

11

specifically call for placement in a residential facility, it acknowledged that A.N.H. had been placed at Family Foundation and several of the identified "goals" in the Hancock IEP seem to be directed toward services provided there. For example, one goal is to "meet with her Senior sponsor on a weekly basis in order to communicate her struggles and apply the 12 steps in working [out] a solution to those troubles." It also identified related programmatic services to be provided to A.N.H. of "Counseling 2x/week, 60 minutes, group; participate in a group for students who were adopted; and consult with the psychologist, psychiatrist, and social worker on an as needed basis." None of these services were provided to A.N.H. by the Hancock Central School District.

In February 2009, the Hardisons filed a due process complaint against the District, arguing, among other things, that A.N.H. had been denied a FAPE. The Hardisons requested that A.N.H. be classified as disabled, that she be provided with appropriate services, and that they be reimbursed for the tuition cost of Family Foundation. As part of a resolution session, A.N.H. was again referred to the District's CSE. Because the Hardisons expressed a desire to keep A.N.H. at Family Foundation in the Comprehensive Social History submitted to the District at that time, District representatives visited Family Foundation on two occasions. During those visits, District employees met with, among others, A.N.H.'s family counselor. Notes of those meetings show that the family counselor reported some positive emotional progress by A.N.H. but also that "'it's been a rocky road.' She is attracted to other students who aren't internalizing the program as well [as] others."

In April 2009, the District held a CSE meeting and classified A.N.H. as having an "[e]motional disturbance" based on her history of depression and self-destructive behavior. (**A973**). According to the District's Director of Special Education, it was appropriate to change

A.N.H.'s classification because the District now had information it lacked when it originally declined to classify her in 2008.

An IEP was created as a result of the April 2009 meeting.  This IEP recommended that A.N.H. be placed in a day treatment center, which the Hardisons agreed to investigate.  The IEP identified A.N.H.'s needs as (1) "a safe, structured, positive environment in which to access and use her academic skills in the Regents curriculum," (2) "therapeutic intervention aimed at developing her ability to recognize distressing feelings and seek help appropriately," (3) "therapeutic intervention aimed at developing peer relationships which result in positive—and not damaging—social relations," (4) "instruction and practice that will allow her to respond to emotional distress with strategies which will lead to short-term relief and long-term growth and maturity," (5) help to "communicate more clearly and effectually—and appropriately—regarding her feelings," and (6) "a therapeutic learning environment which is responsive to her emotional needs and focused on long-term success with the Regents curriculum."  Overall, it found that "[t]he full range of [her] emotional and social needs is such that she needs a therapeutic environment and a structured plan developed outside the school as well as the in-school goals focused on academic success."  The IEP recommended that A.N.H. attend a day treatment program.  The CSE did not assign A.N.H. to the day treatment program at that time, however, deferring assignment until a later meeting after the Hardisons had the opportunity to visit the day treatment program.

The Hardisons visited the day treatment program.  They felt, because it was a "transitional" program, that it was not appropriate for A.N.H. and e-mailed the District's Director of Special Education asking what the next steps should be.  The Hardisons were provided a list of approved residential programs, including facilities for girls A.N.H.'s age who

suffered from emotional disturbances, to review prior to the next CSE meeting. The District did not provide a specific referral to any of these facilities, which, according to the Hardisons, limited their ability to learn about the offered programs. On June 4, 2009, the District's CSE reconvened but again put off assigning A.N.H. a specific placement so that the Hardisons could investigate additional options.

The CSE convened a third time on August 5, 2009. At that meeting, the CSE members agreed with the Hardisons that the day treatment program would not be appropriate for A.N.H. The Hardisons informed the District that the placements they had investigated between meetings were inappropriate for A.N.H., rejecting one because it did not treat eating disorders despite the fact that A.N.H. had not been diagnosed with an eating disorder.[3] The District continued to reject placing A.N.H. at Family Foundation, however, on the grounds that Family Foundation did not have structured special education programs, not all of the teachers were certified teachers, and it was not on the list of schools approved by the New York State Commissioner of Education.

A second IEP was created at the August 5 meeting. It repeated the same list of needs identified in the March 2009 IEP but added that "[a]s the result of a thorough assessment of [A.N.H.'s] strengths and needs in relation to the identified education disability, the CSE has determined that removal from general education is necessary at the identified levels in order to provide the specialized instruction necessary to demonstrate academic achievement." The IEP indicated that a residential placement was appropriate, but it did not specify a school. It permitted placement at any of the "[a]pproved in-State private schools." No referrals to

_____

[3] When asked about A.N.H.'s eating disorder during the IHO's hearing, Mrs. Hardison indicated that she was looking for some sort of support similar to what was offered at Family Foundation where A.N.H. participated in a "food group." Specifically, she testified that "before A.N.H. went to [Family Foundation], one of our big concerns was that she did not eat in a healthy way. And we were glad that when she was at the school, that she was getting some help with that. It wasn't like anorexia, it was more like just unhealthy."

particular private schools were made.  Neither during this meeting, nor in the week that followed, did the Hardisons inform the district that they planned to reject the residential placements offered or that they would seek reimbursement for A.N.H.'s continued placement at Family Foundation.

During the week of August 24, 2009, the Hardisons communicated to the District that, due to the lack of resolution in finding a placement for A.N.H. and the proximity of the IHO's hearing, further CSE meetings or visits to other prospective placements were unnecessary.

*Proceedings Before the IHO*

An impartial hearing was held over four days in September 2009.  The IHO heard testimony from seven witnesses and reviewed seventy-six exhibits in making his decision.  Five of the witnesses were District employees called by the District.  Only two of the witnesses, Mrs. Hardison and Jeffrey Brain, were called by the parents.

Brain, the only Family Foundation employee to testify, is Family Foundation's Vice President for External Relations and Director of Admissions.  He has a master's degree in Clinical Psychology, but is not certified as a psychologist in either New York or New Jersey.  He conducted the "grief and loss survivor group" attended by A.N.H., and claimed familiarity with her through that group and "globally overall."  He indicated that A.N.H. was making good progress in his group at dealing with the loss of her pregnancy and had shown overall improvement, but that none of the therapists overseeing the group was certified as a psychologist in New York or New Jersey.  He indicated that A.N.H. did need some initial psychotherapy upon her second admission, but that he neither knew the details nor did Family Foundation have a formalized process by which individual psychotherapy could be initiated.  According to Brain, the therapeutic and educational components of A.N.H.'s curriculum are integrated such that the school does not "tease out or separate" them.  Brain indicated that he did not perform any

15

psychological testing to measure A.N.H.'s improvement either within his group or overall. He never spoke with A.N.H. about her experiences in prior schools. In the assessment of A.N.H.'s problems, Brain "did not mention school failure."

When Brain was questioned about what special education supports were put in place to assist A.N.H. in the geometry class she was failing at Family Foundation, he was unaware of any particular details and indicated the he did not believe that it was "an issue of Special Education, but identifying where the areas of struggle are." He speculated that she may have failed because "she didn't do homework perhaps or she didn't study for tests." Brain admitted that this same issue may have been the source of her failure at Oneonta High School. Brain indicated that, other than the final grades for students, the school performs no standardized academic evaluations. Brain also testified that he neither directly observed A.N.H. in class, nor spoke with her teachers about her academic progress, saying that "monitoring [A.N.H.'s] performance and functioning" is the responsibility of a student's family counselor. When asked who A.N.H.'s staff sponsor was, Brain indicated he did not know and also that who the staff sponsor was could change over time.

A.N.H.'s family counselor, Family Foundation's on-call psychologist, A.N.H.'s teachers, and A.N.H.'s staff sponsor were not called to testify before the IHO.

The IHO's decision, dated December 13, 2009, found that the District had denied A.N.H. a FAPE for the 2008–2009 and 2009–2010 academic years. The IHO ordered the District to pay A.N.H.'s tuition through January 31, 2010, and to find a suitable placement for A.N.H. for the balance of the 2009–2010 school year.

Specifically, the IHO found that, in 2008–2009 the District failed to provide A.N.H. a FAPE because the school psychologist failed to evaluate thoroughly A.N.H.'s mental health

issues; the CSE failed to develop information relative to A.N.H.'s educational history; and, despite receiving information from the Hardisons that A.N.H was "collapsing into depression," the District did not reconvene the CSE. The IHO concluded that A.N.H.'s placement at Family Foundation was appropriate, and—despite the Hardisons' failure to notify the district of the placement and intention to seek reimbursement prior to enrolling A.N.H. at Family Foundation—there was no equitable impediment to tuition reimbursement.

Regarding the 2009–2010 school year, the IHO determined that A.N.H. was again denied a FAPE because the IEP developed for her neither placed her in a school nor provided referrals to any of the private residential programs on the Commissioner's approved placement list. The IHO continued to find placement at Family Foundation appropriate and—again excusing the Hardisons' failure to provide express notice to the District—held that the equities did not fully bar reimbursement because of the extent of collaboration between the Hardisons and the District when trying to find an acceptable placement for A.N.H.

*Proceedings Before the SRO*

The District appealed the IHO's decision to an SRO. On February 22, 2010, the SRO overturned the bulk of the IHO's decision, finding that the district had not deprived A.N.H. of a FAPE through May 1, 2009; that the Hardisons had failed to demonstrate that Family Foundation was an appropriate placement; and that equitable considerations did not support the Hardisons' reimbursement claim. In reaching its decision, the SRO reviewed the compiled record before the IHO and additional briefing from the Hardisons and the District.

Regarding the 2008–2009 school year, the SRO concluded that as of the January 31, 2008 CSE meeting, A.N.H. failed to meet one or more of the criteria for a student with an emotional disturbance and thus was not denied a FAPE on account of her not being classified at that time.

The SRO also determined, however, that as of May 1, 2009, the CSE had an obligation to recommend a placement for A.N.H. and failed to do so, thus denying A.N.H. a FAPE for the balance of the 2008–2009 school year.

Although the SRO found that the District denied A.N.H. a FAPE, the SRO also determined that the record lacked sufficient information regarding how Family Foundation met A.N.H.'s unique educational needs. In particular, the SRO highlighted the dearth of testimony as to A.N.H.'s academic and therapeutic progress at Family Foundation from those who were directly providing educational and one-on-one counseling services to A.N.H. In particular, the SRO noted the absence of evidence of A.N.H.'s progress from A.N.H.'s family counselor, adoption group counselor, and staff sponsor. Because of the lack of "evidence detailing the specifics of the student's therapeutic services and how those services addressed the student's unique special education needs," the SRO determined that the Hardisons had not demonstrated that A.N.H. was appropriately placed at Family Foundation. The SRO further held that equitable considerations did not support the Hardisons' reimbursement claim.

With respect to the 2009–2010 school year, the SRO similarly ruled that the District denied A.N.H. a FAPE but that the Hardisons did not meet their burden of proving that Family Foundation met A.N.H.'s needs and that equitable considerations did not weigh in favor of reimbursement.

*Proceedings Before the District Court*

The Hardisons filed an action challenging the SRO's decision in the United States District Court for the Northern District of New York. The parties cross-moved for summary judgment. On March 29, 2013, the district court reversed, in part, the SRO's decision, and ordered the District to reimburse the Hardisons for May 1, 2009 to May 31, 2009, and for the

2009–2010 school year.  In doing so, the district court did not review any additional information that had not been submitted to the IHO or SRO.  That is, the record before the district court was the same record that was before the SRO.

Unlike the SRO, the district court found that Family Foundation was an appropriate placement that provided A.N.H. with ample therapeutic support, which contributed to her improved academic performance.  The court departed from the SRO's analysis because it decided that (1) certain factual determinations regarding whether Family Foundation was a "special education school" were in error, (2) sufficient reliance was not placed on the testimony of Mr. Brain and the notes of District employees who visited Family Foundation with regard to A.N.H.'s progress in counseling, (3) too great an emphasis was  placed on A.N.H.'s failing grades at Family Foundation, (4) the SRO had an unreasonable expectation that there be "specific evidence corroborating the fact that A.N.H. availed herself of tutoring," and (5) the SRO misread the types of counseling called for in A.N.H.'s IEPs.  The court further concluded that the equities favored reimbursement for the period of May 1, 2009 to May 31, 2009, and for the 2009–2010 school year.

The District appealed from the district court's decision, and the Hardisons cross-appealed from the district court's agreement with the SRO that the District provided A.N.H. a FAPE from January 2008 to April 2009.[4]

## DISCUSSION

### A.  Standard of Review

We review *de novo* a grant of summary judgment by the district court in an IDEA case. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012).  "[T]he district court must

---

[4] The district court also found against the Hardisons on a Rehabilitation Act claim, which they do not raise on appeal.

19

engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191-92 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1120 (2d Cir. 1997)).

"The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," however, and "courts must bear in mind the statutory context and administrative judges' greater institutional competence in matters of educational policy." *R.E.*, 694 F.3d at 189. As a result, "federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-113 (2d Cir. 2007) (internal quotation marks omitted)). "In deciding what weight is due . . . , the analysis often will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive," such as the "quality and thoroughness of the reasoning, the type of determination under review, and whether the decision is based on the administrative body's familiarity with the evidence and the witnesses." *Reyes*, 760 F.3d at 218 (quoting *M.H.*, 685 F.3d at 244) (internal quotation marks omitted). In particular, "the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO." *M.H.*, 685 F.3d at 244. As a general matter, "[w]hen an IHO and SRO reach conflicting conclusions, we defer to the final decision of the state authorities, that is, the SRO's decision." *R.E.*, 694 F.3d at 189 (internal quotation marks and alterations omitted). In the ordinary case, "[i]t is not for the federal court to choose between the views of conflicting experts on such questions." *Id.* (internal quotation marks and alterations omitted).

B. Appropriateness of A.N.H.'s Placement at the Family Foundation

We are mindful that "unilateral private placement is only appropriate if it provides education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *M.H.*, 685 F.3d at 246 (quoting *Gagliardo*, 489 F.3d at 115); *see also Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 13-14 (1993). When a child has been denied a FAPE, parents have unilaterally placed their child in a private school as a result, and a claim for reimbursement is made, the burden is on the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate. *M.H.*, 685 F.3d at 246; *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014). Here, the SRO and the district court reviewed the same record but ultimately disagreed about whether that record contained sufficient information to conclude that Family Foundation's programs were appropriate for A.N.H.'s specific educational needs. While we are sympathetic to A.N.H. and her parents, and note that A.N.H.'s placement at Family Foundation appears to have helped her with some of her psychological issues, we nevertheless hold that the SRO's determination in this case is sufficiently reasoned and supported by the record to merit deference.

Here, the SRO reached the issue of whether A.N.H.'s placement was appropriate and explained its conclusion. *Cf. C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014); *M.H.*, 685 F.3d at 246, 252 (deferring to the IHO where "the SRO did not reach the question of the appropriateness of [the] private placement"). The SRO's opinion addressed the record evidence in detail, spending four single-spaced pages reviewing the evidence of the services generally available at Family Foundation and repeatedly noting where the record lacked necessary detail as to the services provided or how they related to A.N.H.'s educational progress. After marshalling the evidence, the SRO concluded that to make an appropriate determination he needed more specific information as to the types of services provided to A.N.H. and how those

services tied into A.N.H.'s educational progress.  Expertise in an area speaks not only to the ability to reach the right conclusion about a given factual situation but also the ability to discern how much evidence is required to reach a supportable conclusion at all.  Courts reviewing state institutional decision-makers in IDEA cases must be mindful that a "court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role."  *M.H.*, 685 F.3d at 244.  The determination made by the SRO here, that more particular information was required to reach a particular decision, is a function of the specialized knowledge and expertise possessed in greater degree by state educational policy-makers than by the courts.  That we or the district court may otherwise be willing to draw conclusions from pieces of evidence that the SRO did not believe were appropriate is not enough to demonstrate insufficient reasoning on the part of the SRO.  It is precisely because we recognize that state educational authorities possess greater expertise in drawing conclusions from educational proceedings that it is clearly established in this Circuit that "deference to 'administrative proceedings is particularly warranted where,'" as here, "'the district court's decision was based solely on the administrative record.'"  *Id.* (quoting *A.C.*, 553 F. 3d at 171).

Our independent review of the administrative record reveals that the SRO's conclusion was sufficiently supported by the record to merit deference.  While the record contained a fair amount of testimony and evidence concerning the general program of education offered by the Family Foundation to its students, little of that information constituted the "objective evidence" of progress that is preferable under the law of this Circuit.  *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364, 366 (2d Cir. 2006).  The bulk of the evidence of A.N.H.'s progress at Family Foundation was the subjective assessment of Mr. Brain, who is not a certified psychologist in New York or the state where he obtained his Master's degree, that A.N.H. was

progressing well psychologically. Brain did not know any details of how A.N.H. was progressing academically or how her psychological progress tied into her educational progress. That information was monitored by others at Family Foundation whom the Hardisons chose not to call as witnesses before the IHO.

Other than Brain's testimony, there was some second-hand information—in the form of notes taken by District employees—that A.N.H.'s family counselor, also not a licensed psychologist, subjectively believed A.N.H. was improving psychologically. Those notes, again, involve psychological improvement and not academic improvement, and they do not offer evidence of how the Family Foundation's program was "specifically designed" to channel A.N.H.'s psychological improvement into academic improvement. Rather, they contain evidence of what counseling programs were generally available to students attending Family Foundation and how A.N.H. was doing in those programs.

The "objective evidence" of progress that is on the record—A.N.H.'s grades before and at Family Foundation—can reasonably be viewed as not dispositive in assessing her academic progress. *Id.* at 364 ("Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs."); *see also C.L.*, 744 F.3d at 836. Because Family Foundation is a private school, "it is more difficult to assess the significance of grades and regular advancement." *Frank G.,* 459 F.3d at 364. This is particularly so when the record does not contain specific evidence of what services were actually provided to the student to address the disability that the private placement is intended to ameliorate. *Cf. id.* at 366 (noting record evidence that a teacher worked "one-on-one, created a communications book, gave [the student]

extra time to complete work, and allowed him to work in isolated areas of the classroom"). Had the record contained evidence that A.N.H.'s improved grades were the result of her earlier problem behaviors abating in response to Family Foundation programs, such as evidence that she now regularly completes her homework, her grade improvement might be more informative. However, A.N.H.'s teachers did not testify in that respect, and little evidence to that effect is on the record.

A.N.H.'s overall history of grades—in particular her initial improvement at Bugbee and failure in classes at Family Foundation—makes questionable reliance on her numerical improvement in some areas while at Family Foundation. Indeed, that Brain opined that A.N.H.'s continued academic failures might be on account of the same problematic academic behaviors she exhibited at Oneonta High School is evidence that the counseling A.N.H. receives at Family Foundation is not calculated to provide an educational benefit, rather than a purely psychological one. The SRO's conclusion that he lacked sufficient evidence to determine the appropriateness of A.N.H.'s placement at Family Foundation was, thus, supported by the lack of evidence on the record connecting the counseling services available to A.N.H. to a particular plan for her academic progress or to objective evidence showing that those services had resulted in academic progress. Accordingly, the SRO's determination that "the hearing record lacks sufficient information regarding how Family Foundation provided educational instruction specially designed to meet the unique needs of the student," is reasoned and supported by the record, and it is entitled to deference. The district court should not, consequently, have disturbed the SRO's conclusion.

Because we defer to the SRO's finding that the record lacked sufficient detail to establish that Family Foundation was an appropriate placement for A.N.H., and that finding requires a

denial of reimbursement to the Hardisons, we do not reach the additional issues raised by the parties on appeal.

### CONCLUSION

We have reviewed the parties' additional arguments and find them unavailing. Because we defer to the SRO's determination that the Hardisons did not meet their obligation to demonstrate the appropriateness of A.N.H.'s placement, the Hardisons cannot recover under the IDEA for any portion of the time she was placed at Family Foundation. The judgment of the District Court is, thus, REVERSED as to its determination that partial summary judgment was appropriate for the Hardisons. The case is REMANDED for entry of an order affirming the decision of the State Review Officer.